JOSEPH M. JACKOVICH REVOCABLE TRUST, Dolores M. Jackovich Revocable Trust, Gavora, Inc., John J. Lounsbury, Geraldine S. Lounsbury, and Haman Family Limited Partnership, Appellants,

v.

STATE of Alaska, DEPARTMENT OF TRANSPORTATION, Appellee.

No. S–9686.

Supreme Court of Alaska.

Sept. 6, 2002.

Edward R. Niewohner, Niewohner & Associates, P.C., Fairbanks, for Appellants.

Mason Damrau, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Owners of improved real properties asserted inverse condemnation claims against the State of Alaska, complaining that information the state published about its intentions to acquire land needed for a projected road project deprived them of the full use and enjoyment of their properties, reduced the value of their properties, and constituted de facto takings. The superior court dismissed their claims on summary judgment. We affirm. Taking all permissible factual inferences in favor of the landowners, we conclude that the state did not publicly announce a concrete intention to use or condemn specific parcels of the owners' properties or engage in activity that substantially interfered with the use and enjoyment of their properties.

## II. FACTS AND PROCEEDINGS

### A. The Illinois Street Project

The Illinois Street project is a component of a major highway construction project called the Geist Road Extension Project, begun in Fairbanks in the mid 1970s. The Illinois Street component, if it is to be built at all, will be the final segment built in the Geist Road Extension Project. The landowners involved in this appeal own parcels of improved commercial property along Illinois Street in downtown Fairbanks.[1] We sometimes refer to them collectively as the Jackovich landowners.

In 1977 the Federal Highway Administration authorized the Alaska Department of Transportation (DOT) to begin the location phase of the Geist Road Extension Project. Initial engineering and environmental impact studies were completed in 1983. Public hearings concerning the location of the project were held in 1983. DOT received federal location approval by 1985. The project was undertaken in segments, several of which were completed in the late 1980s and early 1990s. The design for the Illinois Street portion of the project was revised several times between 1985 and 2000. The plans have contemplated a range of three-, four-, and six-lane highway designs. The initial location approval contemplated that the Illinois Street connector would be constructed as part of the Aurora Subdivision–to–Lementa Subdivision segment; but this segment was completed in 1991 without the Illinois Street connector. Unforeseen design complications caused DOT to abandon this plan and ultimately to adopt the plan, known as the Illinois Street/Minnie Street connector plan, that is involved in this dispute. No final design had been approved as of February 1, 2000, when the superior court heard argument on cross-motions for summary judgment in this lawsuit.

Throughout the phases of the Geist Road and Illinois Street projects, DOT made efforts to notify the landowners and the public of the progress of the projects, as federal law required. These efforts included issuing notices of public hearings, workshops, and local government hearings and meetings, and publishing the Statewide Transportation Improvement Program. DOT also developed a mailing list which included individuals and businesses who owned or occupied property near the highway corridor. The landowners in this case were on this mailing list and received several installments of DOT's "Illinois Street Newsletter." For example, the January 1993 Newsletter stated:

### Right–of–Way Begins Soon

The Federal funds are set aside and will be obligated this year for the right-of-way acquisition along Illinois Street. The right-of-way phase should take approximately two years to complete.

One of the landowners, John Lounsbury, wrote DOT in April 1997 asking the state to execute an advance acquisition of his property. DOT declined, even though in 1993 it had acquired the Rose Building, which was

---

1. The landowners are the Joseph M. Jackovich Revocable Trust, the Dolores M. Jackovich Revocable Trust, Gavora, Inc., John J. Lounsbury, Geraldine S. Lounsbury, and the Haman Family Limited Partnership. The Jackovich trusts own two parcels containing four lots; Gavora, Inc. owns three parcels containing three lots; the Haman partnership owns five lots; and the Lounsberrys own two lots.

located in the vicinity and was projected to be within the scope of the Illinois Street right-of-way.

### B. The Inverse Condemnation Suit

In November 1997 the landowners filed their inverse condemnation complaint against the state, alleging de facto takings of and damage to their properties.[2] They moved for partial summary judgment, arguing that no material facts were in dispute as to their claim that DOT's pre-condemnation publicity had reduced the economic value of their properties and required just compensation. In support of their motion, the landowners submitted evidence of lost property value, public announcements of the Illinois Street project, and the state's acquisition of the Rose Building. DOT opposed the motion and cross-moved for summary judgment.

In support of DOT's opposition and motion, John Miller, DOT's Chief Right-of-Way agent in Fairbanks at relevant times, swore in an affidavit that "DOT has never announced an unequivocal intention to acquire any of the particular real properties along Illinois Street." DOT argued that the landowners' claims failed because the landowners did not provide evidence of DOT's intent to condemn their specific properties and did not rebut Miller's statement.

At oral argument on the motions, the landowners attempted to supplement their exhibits with copies of letters DOT wrote the landowners addressing the future acquisition of their specific properties. The state objected to introducing these supplemental exhibits. The superior court ruled that it would not consider the exhibits unless an appropriate motion were filed. The landowners never filed a motion asking the court to accept the exhibits.

In March 2000 the superior court denied the landowners' motion for summary judg-ment and granted the state's cross-motion for summary judgment. The court first reasoned that the publicity complained of could not be considered a "de facto" taking because it did not amount to either a physical invasion of property or a direct legal restraint on its use. The court further reasoned that the "condemnation blight" doctrine did not apply because the property was never actually condemned.[3]

The superior court then ruled that the claim was properly evaluated under precedents establishing an inverse condemnation cause of action based solely on pre-condemnation publicity.[4] The court concluded that the Jackovich landowners could not establish an essential element of this cause of action: proof of a public statement of the state's "concrete" intention to acquire specific property.[5] The court determined that the landowners' claims "contain no allegation of any public expression of intent to use a specific piece of property." The court concluded by reasoning that this requirement properly accommodated the public interest in community planning while protecting the landowners' constitutional right to just compensation.

The landowners moved for reconsideration and attached the disputed supplemental exhibits to their reconsideration motion. The superior court denied their reconsideration motion. It appears that as of April 4, 2000, when the superior court entered final judgment, the state had commenced no condemnation proceedings for any of these particular properties.

The landowners appeal.

### III. DISCUSSION

The landowners advance alternative theories of recovery. First, they argue that existing Alaska law requires that property owners be compensated when government

---

2. The landowners filed their First Amended Complaint in November 1999.

3. The court explained that the condemnation blight doctrine is effectively a rule of evidence for setting the proper valuation date in the just compensation phase of an eminent domain proceeding. *See* 8A Nichols on Eminent Domain § 18.04[3] (3d ed.1998).

4. Under this theory, the fact that the property is never actually condemned does not bar the conclusion that a taking has occurred.

5. *Homeward Bound, Inc. v. Anchorage Sch. Dist.*, 791 P.2d 610, 614 (Alaska 1990).

publication of an "unequivocal intent" to appropriate their property damages them, even when their property is not ultimately condemned. They further argue that the publicity in this case satisfies this intent standard. Second, they argue that they should recover under the case-specific analysis we use to decide whether government action that does not constitute a "per se" taking is nonetheless a compensable taking.

As to the first issue, we conclude that the superior court correctly determined that the publicity in this case does not satisfy the "concrete intention" test. As to the second, we conclude that the case-specific approach is inapplicable because the existing pre-condemnation publicity cause of action adequately addresses the problems at hand. We further conclude that the case-specific approach is inapplicable where the challenged government action does not directly limit the property owner's use or exclusive control of her property.

### A. Standard of Review

We review grants of summary judgment de novo.[6] Summary judgment should be affirmed if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[7] We read the record in the light most favorable to the non-moving party and draw all reasonable factual inferences in his or her favor.[8] We review questions of constitutional law, such as whether a taking has occurred, de novo.[9] We will adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[10]

Thus, in reviewing the superior court's conclusion that the state had no concrete intention to condemn the landowners' proper-

ties, we draw all reasonably permissible factual inferences in favor of the landowners, the opponents of the state's cross-motion for summary judgment.

### B. It Was Not Error To Dismiss the Landowners' Inverse Condemnation Claim on Summary Judgment.

#### 1. Landowners' *Ehrlander/Lange/Homeward Bound* theory

The landowners' main argument on appeal is that under existing Alaska law, the state is constitutionally required to compensate them because, by publishing an "unequivocal" pre-condemnation intent to appropriate their properties, it deprived them of the economic advantages of ownership. They rely on two Alaska cases—*Ehrlander v. State, Department of Transportation,*[11] and *Homeward Bound, Inc. v. Anchorage School District*[12]—as well as a Washington case—*Lange v. State*[13]—which we approvingly discussed in *Ehrlander.*[14]

Before discussing the legal issues presented, we note the factual posture of this case. It involves the state's pre-condemnation publication of notices, information, plans, and proposals pertaining to a road improvement project component that, as of the time the parties sought summary judgment, might or might not be built. This component of the overall project had not became final, and its scope was uncertain. Its impact on the landowners' parcels was consequently uncertain, and the publications attributed to the state reflect this uncertainty. Likewise, there was uncertainty about what specific parcels or portions thereof might be acquired. We also note that these properties were improved with commercial buildings and that there is

**6.** *Balough v. Fairbanks N. Star Borough,* 995 P.2d 245, 254 (Alaska 2000).

**7.** *Id.*

**8.** *Id.*

**9.** *Anchorage v. Sandberg,* 861 P.2d 554, 557 (Alaska 1993); *Triangle, Inc. v. State,* 632 P.2d 965, 968 (Alaska 1981) ("It is only when a trial court concludes that the landowner has presented a valid claim that the case is submitted to the jury for a determination of the extent of the

taking and the amount of compensation that must be paid by the state.") (citations omitted).

**10.** *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**11.** 797 P.2d 629 (Alaska 1990).

**12.** 791 P.2d 610 (Alaska 1990).

**13.** 86 Wash.2d 585, 547 P.2d 282 (1976).

**14.** 797 P.2d at 633–35.

no evidence the state actively interfered with the beneficial use of these properties by (1) limiting their development, improvement, or occupancy; (2) denying the landowners any permits needed to develop, improve, or use these properties; (3) notifying tenants they would have to vacate or would be compensated for vacating; or (4) informing the owners that in event of condemnation, they would not be compensated for maintaining or improving their properties. Instead, the common thread in the landowners' superior court affidavits is that they are unable to sell their properties and that they lost rental income because pre-condemnation announcements discouraged buyers and renters and made improvements infeasible or economically imprudent.

The Alaska Constitution provides that "private property shall not be taken or damaged for public use without just compensation." [15] "Private property is taken or damaged for constitutional purposes if the government deprives the owner of the economic advantages of ownership." [16] "Once private property is taken or damaged, the owner is entitled to be placed in the same position as he would have occupied absent the governmental interference." [17]

We have held that under some circumstances landowners may be entitled to compensation from government entities whose activities diminish the value of their properties even though the government never actually condemns the properties. Thus, in *Homeward Bound*, we stated:

> [I]n cases such as this one where the alleged taking is based on precondemnation decisions concerning the subject property, the objective manifestations of the government's intention to take the property are critical to the decision whether there was a taking. This is because the government's indications of its intention to condemn the property are the source of the owner's claimed damages. [18]

Homeward Bound claimed that the municipality and the school district had inversely condemned its unimproved property by designating it as a potential school site, temporarily diminishing its value. [19] In discussing cases "where the alleged taking is based on precondemnation decisions concerning the subject property," we referred in *Homeward Bound* to California law, originating in *Klopping v. City of Whittier*, [20] that allows landowners to recover for loss in the value of their properties due to governmental precondemnation activity. The California Supreme Court held in *Klopping*:

> [A] condemnee must be provided with the opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value. [21]

We then held in *Homeward Bound* that to recover for damages caused by pre-condemnation governmental activities that do not otherwise amount to a de facto taking, an Alaska plaintiff must show a concrete indication that the state intended to condemn the property. [22] Approvingly citing one of *Klopping's* early progeny, we explained:

> Later, in *Selby Realty, Co. v. City of San Buenaventura* [10 Cal.3d 110, 109 Cal. Rptr. 799, 514 P.2d 111 (1973)], the [California Supreme Court] held that the mere enactment of a general plan showing proposed streets extending through private

---

15. Alaska Const. art. I, § 18. "The requirement that the condemner pay just compensation when property is damaged provides broader protection for private property rights than the fifth amendment to the United States Constitution." *Homeward Bound*, 791 P.2d at 614 (citations omitted).

16. *Homeward Bound*, 791 P.2d at 614 (citations omitted).

17. *Id.* (citations omitted).

18. *Id.*

19. *Id.* at 613–14.

20. 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345 (1972).

21. *Id.* at 1355.

22. *Homeward Bound*, 791 P.2d at 614.

property did not constitute a taking because there was "no present concrete indication that the county either intends to use plaintiff's property for the proposed streets or that it intends to acquire the property by condemnation." The court distinguished *Klopping* on the ground that "the adoption of a general plan is several leagues short of a firm declaration of an intention to condemn property." [23]

In considering the claims of the Jackovich landowners, the superior court characterized Alaska takings law as requiring "a public statement of 'concrete' intention to acquire specific property before a *Klopping* claim will lie." [24] Applying this rule, the superior court dismissed the landowners' claim on summary judgment. It concluded that "even *Klopping*—the most expansive holding this court has been able to identify in terms of affording compensation to disadvantaged property owners—does not reach the facts of the present case, which contain no allegation of any public expression of intent to use a specific piece of property."

The Jackovich landowners do not ask us to adopt *Klopping*, which they say may have adopted a requirement—that the government have acted improperly—that is foreign to established inverse condemnation law in Alaska.[25] They instead assert that in *Ehrlander* we adopted a broad doctrine of compensability by relying on principles discussed by the Washington Supreme Court in *Lange v. State*.[26] Our *Ehrlander* opinion approvingly discussed as follows the reasoning of the Washington court in *Lange*:

> In our view this reasoning should be applicable not merely when a condemnation

action is formally begun, but whenever a property owner is, by reason of an impending condemnation, deprived of the economic advantage of ownership. That was the rationale of the Washington court in *Lange*:

> Once the state manifested its unequivocal intent to appropriate the Lange property, appellants were precluded from exercising their business judgment and selling the property before the market fell further. Moreover, appellants were precluded from taking any steps to counteract the market decline by making improvements on the land or otherwise changing its use. Thus appellants were deprived of the most important incidents of ownership, the rights to use and alienate property.

547 P.2d at 288. We thus agree with *Lange* and believe that its holding should be applicable here. As the *Lange* test does not require either extraordinary delay or a bad faith motive to depress land prices, the state's argument that the absence of these factors means that Ehrlander has not made a prima facie case of an imputed taking must fail.[27]

Ehrlander, like Lange, asserted claims that the government engaged in pre-condemnation activity that caused his unimproved real property to decline in value before the state began condemnation proceedings to acquire the land. Ehrlander claimed that the state's unreasonable delay in bringing the condemnation proceedings after it announced its intention to use his property for a highway project resulted in an imputed taking.[28] The superior court granted summary judg-

**23.** *Id.* (citation omitted).

**24.** *E.g., City of Kenai v. Burnett,* 860 P.2d 1233, 1240 (Alaska 1993) (holding that city did not demonstrate "unequivocal intention" to take easement); *Homeward Bound,* 791 P.2d at 614 (holding that no taking occurred because municipality's "mere designation" of property as school site was not a "concrete indication" that municipality intended to condemn property).

**25.** As we will see, this case does not turn on application of the *Klopping* requirements. The superior court appears to have relied on the case only to demonstrate that under the "most expansive" doctrine, i.e., the doctrine most favorable to

the landowners, the state was still entitled to summary judgment. We have not expressly adopted *Klopping* as a statement of law governing an inverse condemnation claim for a government's precondemnation activities. Because the landowners do not urge us to apply *Klopping* in this case, it is not necessary to decide here whether Alaska would recognize a *Klopping* claim.

**26.** 86 Wash.2d 585, 547 P.2d 282 (1976).

**27.** *Ehrlander,* 797 P.2d at 635.

**28.** *Id.* at 633.

ment to the state because the state did not unreasonably delay or have a bad faith motive to depress land prices. Holding that those were not requirements for a claim under *Lange*, we reversed and remanded for consideration of Ehrlander's imputed taking claim and for application of the four-element test set out in *Lange*.[29]

Lange filed his inverse condemnation claim about one year before the state filed an eminent domain action to acquire land he had purchased to develop and sell.[30] The Washington Supreme Court applied a four-element test to decide in the formal condemnation proceeding whether to advance the date of valuation.[31] *Lange* is properly regarded, like *Ehrlander*, as an example of an early valuation eminent domain case.

The four-element *Lange* test does not expressly apply to or encompass the claims of the Jackovich landowners. Rather than trying to advance the date of taking for valuation purposes where it is undisputed that the state has taken the property, they are trying to establish that there was a taking; it is the taking that is disputed, not the date when it occurred. And the Jackovich landowners do not hold unimproved property which they had acquired to develop and sell; their property was income producing and continued to produce at least some income at pertinent times. If the state cancels the Illinois Street part of the project without acquiring their

properties, the prospect of condemnation will no longer arguably affect the income their properties generate. On its face, the *Lange* test does not appear to apply to an inverse condemnation claim where the state never acquires the property.[32]

Nonetheless, we recognized in *Homeward Bound* that pre-condemnation governmental activity could in theory amount to a temporary taking that would entitle an owner to compensation even if the plan to condemn were abandoned.[33] One can imagine that pre-condemnation publicity could depress income actually realized from improved commercial property, leading to a temporary taking that requires compensation. But it is not so obvious what standards should be applied to such a claim. How long must an owner endure such publicity before it becomes a compensable temporary taking? What decline in value is large enough to be cognizable? Our decisions do not answer those questions.

We do not need to explore those issues here, nor others that may arise from permitting an inverse condemnation claim based on pre-condemnation publicity where no eminent domain condemnation has yet occurred and may never occur. We think that at a minimum in such a case, the government must have publicly announced a present intention to condemn specific properties,[34] and

---

29. *Id.* at 635.

30. *Lange,* 547 P.2d at 283.

31. *Id.* at 288.

32. *Id.* at 283, 288 (characterizing issue as whether valuation date in condemnation trial should be advanced due to pre-condemnation conduct and concluding that it should). The Washington appellate courts have not addressed the question whether the *Lange* test would apply to a case in which the property in question was not ultimately condemned, but it is highly doubtful that *Lange* would be applied in such a case. The Washington Supreme Court's discussion of *Lange* in subsequent cases suggests that the *Lange* rule is only applicable to cases in which property is actually condemned. *E.g., State v. McDonald,* 98 Wash.2d 521, 656 P.2d 1043, 1050 (1983) (stating that *Lange* merely modifies time of valuation in certain cases where doing so is necessary to award just compensation); *Brazil v. City of Auburn,* 93 Wash.2d 484, 610 P.2d 909, 916 (1980) (citing *Lange* for the proposition that "[t]he mea-

sure of damages is the fair market value of the property at the date of trial, unless fairness to the owner requires the value to be set as of some other date").

33. *Homeward Bound,* 791 P.2d at 613–15 (considering whether temporary designation of property as school site constitutes taking); *see also Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, ——, 122 S.Ct. 1465, 1470, 152 L.Ed.2d 517 (2002) (considering whether imposing "temporary" moratoria on development constitutes per se taking).

34. *Selby Realty Co. v. City of San Buenaventura,* 10 Cal.3d 110, 109 Cal.Rptr. 799, 514 P.2d 111, 116 (1973) (holding that no actual controversy existed between property owner and county where general plan showed streets running through owner's property because plan could not be read to constitute "present concrete indication that the county either intends to use [the owner's] property for the proposed streets or that it intends to acquire the property by condemnation").

it must have done something that substantially interferes with the landowners' use and enjoyment of their properties.[35] These minimal requirements present two insurmountable obstacles to the claims of the Jackovich landowners in this case as it is presented to us.

### a. DOT has not expressed a present concrete intention to acquire any specific property.

■ First, the public announcements attributable to the state, even taking all permissible factual inferences in the landowners' favor, fall short of permitting a finding that DOT expressed a present concrete intention to condemn specific property. The landowners argue that the superior court erred in reaching this conclusion. They point to maps and newsletters identifying their properties as land to be condemned under the Illinois Street project. They refer to the January 1993 DOT Newsletter passage we quoted above in Part II.A. The landowners also point to correspondence, contained in supplemental exhibits, discussing the possibility of condemnation. The supplemental exhibits included letters from DOT to the landowners addressing future acquisition of their specific properties. One letter stated that "a portion of your property will be required for additional right-of-way for the referenced highway project," and another purported to announce "our current schedule and expectations for this project—specifically the acquisition of your property at 224 to 226 Illinois Street." As previously mentioned, the superior court refused to consider these letters at oral argument on the cross-motions for summary judgment pending an appropriate motion, and no such motion was ever brought.

Read in the light most favorable to the landowners, the evidence (including the rejected supplemental exhibits) does not reasonably permit an inference that DOT had expressed a present concrete intention to condemn specific portions of the landowners' properties in the near future.

First, the maps, newsletters, and any other general publicity produced by DOT indicating that the Illinois Street Extension would pass through certain private properties are insufficient to constitute the requisite "present concrete intention" to acquire specific property. In *Selby Realty*, the California Supreme Court held that "adoption of a general plan is several leagues short of a firm declaration of an intention to condemn property." [36] The court explained that imposing liability on the basis of such publicity would either cause the process of community planning "to grind to a halt," or else reduce such planning to "vacuous generalizations regarding the future use of land." [37] This reasoning applies to all of the general publicity at issue in this case. DOT should be encouraged to provide meaningful notice to the public of major projects that will affect private development; imposing liability on the basis of such publicity would have exactly the opposite effect.

Second, the specific letters from DOT to the landowners concerning future acquisition of their properties are likewise insufficient. Read in the light most favorable to the landowners, a fact-finder could reasonably conclude that DOT intended to acquire their property at some unspecified future time. But our intent test requires a *present* concrete intention to acquire property, and the letters cannot be fairly read to satisfy this test. None of the letters expresses an intent to initiate acquisition proceedings immediately. Indeed, the three letters that most clearly express DOT's intent to acquire specific properties all indicate that hazardous substances investigations must be performed before fair market valuations for the properties can be determined. One of the letters indicates that the "right of way acquisition process for this project" would not even *begin* for a full year from the date of the letter, and another letter advised the property owner to undertake planned improvements despite

---

**35.** *E.g., Barthelemy v. Orange County Flood Control Dist.,* 65 Cal.App.4th 558, 76 Cal.Rptr.2d 575, 582 (1998) (collecting cases regarding required level of state interference to make out *Klopping* inverse condemnation claim and holding that public entity's conduct must have signifi-

cantly invaded or appropriated use or enjoyment of claimant's property).

**36.** 109 Cal.Rptr. 799, 514 P.2d at 117.

**37.** *Id.*

DOT's intention to acquire the property in the future due to anticipated complications with site contamination and obtaining approval to acquire the property via the "advanced acquisition" process.

The Jackovich landowners have not pointed to any case supporting their claim that the letters in this case are sufficiently definite to satisfy the "present concrete intention" requirement, and we are aware of none. In *Klopping,* the California Supreme Court held that the city demonstrated a sufficiently specific intent to condemn property when it initiated condemnation proceedings, dismissed the action, but declared its intention to take the property in the future.[38] But in this case the state had not initiated condemnation actions regarding any of the properties at the time the superior court entered its final order.

Conversely, in *Homeward Bound* we held there was no "concrete indication" to acquire specific land despite the fact that the Anchorage municipal assembly had passed two resolutions designating the owner's property as a school site, because the school district, which had final authority to approve the site, had not done so.[39] DOT's intention to acquire the Jackovich landowners' properties is at least as indefinite. The Illinois Street Project has gone through numerous changes, and there was no finalized plan at the time the superior court entered judgment in this case.

### b. DOT has not substantially interfered with the Jackovich landowners' property rights.

There is no indication the state did anything more than make announcements, pre-

pare and publish plans, and provide publicity concerning the project. As noted above, there is no evidence that the state actively interfered with the landowners' beneficial use of their properties, such as by prohibiting them from using their properties beneficially or denying needed permits.[40]

### c. *Ehrlander* and *Lange* are inapplicable because the Jackovich landowners' properties have not been condemned.

The Jackovich landowners seem to imply that they have stated a legally sufficient claim under the rule of *Lange,*[41] which we applied in *Ehrlander.*[42] But in those cases the state ultimately condemned the claimant's property.[43] *Lange* and *Ehrlander* are therefore properly regarded as early valuation eminent domain cases; they do not establish the appropriate standard for reviewing the state's pre-condemnation conduct where condemnation proceedings are either abandoned or never initiated.

### 2. Landowners' case-specific *Sandberg* theory

■ The landowners briefly advance an alternative inverse condemnation theory. They assert that we should consider their claim under the case-specific analysis we apply in deciding whether government action has effected a compensable taking even though it does not fall into the two recognized classes of per se takings. Apparently in support of this alternative theory, their

**38.** 104 Cal.Rptr. 1, 500 P.2d at 1348.

**39.** 791 P.2d at 614.

**40.** The court in *Selby Realty* stated:
> The county has not placed any obstacles in the path of plaintiff in the use of its land. Plaintiff has not been refused permission by the county to build on or subdivide its county land, and its posture is no different than that of any other landowner along the streets identified in the plan. Furthermore, the plan is subject to alteration, modification or ultimate abandonment, so that there is no assurance that any public use will eventually be made of plaintiff's property.

109 Cal.Rptr. 799, 514 P.2d at 119. *See also Jones v. City of Los Angeles,* 88 Cal.App.3d 965, 152 Cal.Rptr. 256, 261 (1979) ("[A] showing that the [entity's] conduct went beyond mere general planning may not in itself be sufficient to state a cause of action. The claimant must show that obstacles were placed in plaintiffs' path in the use of this land.").

**41.** 547 P.2d at 288.

**42.** 797 P.2d at 634.

**43.** *Id.* at 632; *Lange,* 547 P.2d at 283.

reply brief argues that the evidence demonstrates that the state engaged in "unreasonable and negligent conduct."

The state neither physically invaded these properties nor by regulation denied the owners all economically feasible use of their properties. The state's alleged acts here consequently do not fall within either recognized class of per se takings.[44] But that does not mean, as the Jackovich landowners may assume, that we must consider the state's alleged acts in light of the case-specific analysis we apply to non-per se, or ad hoc, alleged takings.

We have never applied the case-specific analysis to a case involving pre-condemnation governmental activity.[45] We have applied it to date only to cases in which the government has, in its governmental capacity, allegedly restricted landowners from using their property or deprived them of the exclusive use of their property.[46]

We are reluctant to apply this doctrine to a pre-condemnation case. Doing so would seem to needlessly parallel or muddy the remedy discussed in Part III.B.1 above. The landowners' relatively terse arguments provide no compelling reason to do so in this case.

Moreover, it is not clear how the case-specific factors we have identified might apply in such a case.[47] The fourth factor—the legitimacy of the interest advanced by "the regulation or land-use decision"—implicitly recognizes that an ad hoc takings claim turns on an action having the purpose of affecting the landowner's property rights. But there is no indication here the actions attributed to the state had any purpose of affecting or limiting the owners' rights or use of the affected properties. The complained-of actions were taken to give the owners and the community notice of the project's potential scope and progress.

Likewise, the state correctly argues that the landowners' opening brief does not substantively discuss any factor other than economic impact, and observes that the state's actions were federally required. The landowners simply argue in their reply that the legitimacy of the state's interest is lost when the state's conduct "becomes negligent and unreasonable." Not only did they not discuss this factor in their opening brief, they

---

**44.** *R & Y, Inc. v. Municipality of Anchorage,* 34 P.3d 289, 293 (Alaska 2001) (stating that per se taking can result through physical invasion of land or application of regulation that deprives landowner of all economically valuable use of land); *Beluga Mining Co. v. State, Dep't of Natural Res.,* 973 P.2d 570, 575 (Alaska 1999); *Anchorage v. Sandberg,* 861 P.2d 554, 557 (Alaska 1993); *see generally Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (affirming state court rejection of *Lucas* takings claim where state regulated wetlands but did not deprive owner of all economic use of property, and remanding for consideration of owner's claims under *Penn Central* analysis); *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

**45.** The case-specific takings clause analysis originates in the Supreme Court's decisions. *See, e.g., PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (identifying several factors to determine whether governmental action has gone beyond mere regulation, including "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations") (citation omitted); *see also Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (explaining that courts must "engag[e] in ... es-

sentially ad hoc, factual inquiries" to determine when "justice and fairness" require public as whole rather than small number of disproportionately burdened landowners bear costs of regulation).

**46.** *E.g., R & Y, Inc.,* 34 P.3d 289 (Alaska 2001) (where municipality imposed improvement setback restriction in wetland area); *Balough v. Fairbanks N. Star Borough,* 995 P.2d 245 (Alaska 2000) (where junkyard was no longer permissible use following rezoning); *Cannone v. Noey,* 867 P.2d 797 (Alaska 1994) (where state imposed restrictions on subdivision); *Anchorage v. Sandberg,* 861 P.2d 554 (Alaska 1993) (where municipality's decisions in opposing improvement district prevented landowner from creating improvement district); *State, Dep't of Natural Res. v. Arctic Slope Reg'l Corp.,* 834 P.2d 134 (Alaska 1992) (where state law required well operators to disclose their drilling results to state, thus denying them exclusive use of their data).

**47.** The factors are: "(1) the character of the governmental action; (2) its economic impact; (3) its interference with reasonable investment-backed expectations; and (4) the legitimacy of the interest advanced by the regulation or land-use decision." *R & Y,* 34 P.3d at 293.

do not support this assertion with authority. If we were to accept this proposition, it would seem to require an inquiry about the reasonableness of the government's actions in every case involving a proposed public works project in which no de jure acquisition occurs. At first glance, this would seem to demote takings law from the realm of constitutional protection to the land of ordinary negligence.

We consequently decline to decide whether to apply the case-specific analysis in this case.

## IV. CONCLUSION

For these reasons, we AFFIRM the grant of summary judgment to the state.