**SPINELL HOMES, INC., Appellant,**

v.

**MUNICIPALITY OF ANCHORAGE,**
Appellee.

No. S–10546.

Supreme Court of Alaska.

Aug. 22, 2003.

Rehearing Denied Nov. 5, 2003.

David J. Schmid and Eric R. Cossman, Law Offices of David J. Schmid, Anchorage, for Appellant.

Steven S. Tervooren, Hughes, Thorsness, Powell, Huddleston & Bauman, LLC, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

A homebuilding company challenges conditions the Municipality of Anchorage imposed on the issuance of building permits and certificates of occupancy for certain homes. Because the Anchorage Municipal Code gave the municipality the authority to impose the challenged conditions, we affirm the decision of the superior court denying the plaintiff's motion for summary judgment and granting summary judgment to the municipality.

### II. FACTS AND PROCEEDINGS

Spinell Homes, Inc. constructs houses on property it acquires; it then sells the completed homes to third-party purchasers. Spinell must obtain a building permit from the Municipality of Anchorage before constructing a home in Anchorage.[1] After completing the home, Spinell must obtain a certificate of occupancy from the municipality before the structure can be occupied.[2]

Between 1995 and 1999 Spinell purchased from various development corporations all or large parts of five residential subdivisions in Anchorage: the Michael Subdivision, the Ponds Subdivision, the Independence Park Subdivision, the Ridgemont Subdivision, and the Muirwood Park Subdivision. The original subdividers of those tracts had entered into subdivision agreements with the municipality as required by the Anchorage Municipal Code (AMC).[3] The code required that these subdivision agreements contain specified information, including a designation of public improvements to be constructed by the subdivider and by the municipality, and the specifications and scheduled completion dates for those improvements.[4]

The original subdivider for the Michael Subdivision entered into a subdivision agreement with the municipality to construct and install certain public improvements, including streets, sidewalks, curbs, gutters, and drainage. Spinell eventually acquired all the lots in the Michael Subdivision from Columbia Investments, Inc., another subdivider. Columbia and Spinell agreed that Columbia would construct all of the improvements for the subdivision in accordance with the Municipality's Standard Specifications (MASS). But Columbia failed to complete the improvements to MASS standards.

---

1. Uniform Administrative Code (UAC) § 301.1 (1997) provides:

   Permits required. Except as specified in Section 301.2, no building, structure or building service equipment regulated by this code and the technical codes shall be erected, constructed, enlarged, altered, repaired, moved, improved, removed, converted or demolished unless a separate, appropriate permit for each building, structure or building service equipment has first been obtained from the building official.

2. UAC § 309.1 (1997) provides:

   Use or Occupancy. Buildings or structures shall not be used or occupied nor shall a change in the existing occupancy classification of a building or structure or portion thereof be made until the building official has issued a certificate of occupancy therefor as provided herein.

3. Anchorage Municipal Code (AMC) 21.87.010(A) (1996) provides:

   Before a final plat for a subdivision where improvements are required under chapter 21.85 is approved or filed, the subdivider shall enter into a subdivision agreement with the municipality in accordance with this chapter.

4. AMC 21.87.010(C) (1996).

After Spinell acquired the Michael Subdivision, it applied to the municipality for building permits to construct homes. The municipality refused to issue any building permits for lots in the Michael Subdivision until the streets were constructed to MASS specifications. Spinell demanded that Columbia construct the streets to MASS standards, but Columbia refused. The municipality then proposed to Spinell that it would conditionally accept the streets even though they did not meet MASS standards if Spinell would warrant the streets for five years and post a $100,000 guarantee bond. Spinell provided the warranty (in the form of two trust deeds), and the municipality then issued building permits to Spinell for the Michael Subdivision.

The original subdividers in the Michael, Ponds, and Independence Park Subdivisions had each entered into subdivision agreements with the municipality which obligated them to dedicate and construct public improvements, including landscaping easements. Buffer landscaping easements listed on the plat notes burdened some lots in each subdivision.

The municipality refused to issue Spinell final certificates of occupancy (and, in a few instances, building permits) for lots burdened with buffer landscaping easements until the landscaping was installed. For lots on which the municipality withheld final certificates of occupancy, it issued temporary certificates and conditioned final certificates on installation of the landscaping. These temporary certificates allowed the homes to be occupied and enabled Spinell to sell the homes, but they affected the buyer's ability to obtain conventional financing for the homes or resell them before final certificates were issued.

The municipality also required Spinell to install "on lot" landscaping on some individual lots in the Michael and Ridgemont Subdivisions. The plat notes for those lots required the installation of landscaping—in many cases, two or three trees per lot. The municipality issued conditional certificates of occupancy for the homes built on these lots but refused to issue final certificates until the on-lot landscaping was installed.

As a condition for issuing building permits for two lots in the Ridgemont Subdivision, the municipality required Spinell to obtain written approval for the design of its proposed homes from the Independence Park Community Association Design Review Committee, which both parties describe as a homeowners' association. Spinell obtained this permission and the municipality issued the building permits.

As a condition of issuing a building permit for one lot in the Muirwood Park Subdivision, the municipality required Spinell to obtain written verification from the original subdivider that Spinell had disturbed no living trees. Spinell presumably met this requirement because the municipality issued the building permit.

In 1999 Spinell filed a complaint against the municipality for inverse condemnation, and also alleged under 42 U.S.C. § 1983 that the municipality had violated Spinell's rights to substantive due process and equal protection and had effected a taking. Spinell sought (1) a declaratory judgment ordering the municipality to issue the relevant final certificates of occupancy, reconvey the performance bond for the Michael Subdivision, and install buffer landscaping and all other public improvements on the Michael Subdivision at the municipality's expense; (2) a permanent injunction preventing the municipality from imposing on the issuance of building permits and certificates of occupancy conditions that are not authorized by the municipality's ordinances; and (3) a permanent injunction preventing the municipality from requiring Spinell to satisfy the obligations of a subdivider. Spinell also sought compensation for the alleged taking, and compensatory damages in an unspecified amount greater than $100,000.

After the superior court granted in part and denied in part the municipality's motion to dismiss, both parties moved for summary judgment. The superior court determined that Spinell's constitutional claims "are predicated on whether the Municipality wrongfully denied Spinell's request for building permits and certificates of occupancy." The court then held that the municipality had authority

to require Spinell to comply with municipal requirements as a condition for issuing the permits and certificates. It granted the municipality's summary judgment motion and denied Spinell's summary judgment motion.

Spinell appeals.

## III. DISCUSSION

### A. Standard of Review

The parties dispute the standard of review. Spinell argues that we should apply our customary de novo standard to a grant of summary judgment. The municipality argues that we should apply the standard of review that we use for examining administrative decisions, on the theory that this case involves the review of "administrative decisions involving complex issues that require agency expertise." It relies on our statement in *Ellis v. State, Department of Natural Resources* that in those situations, we will defer to the agency's determination "so long as it is reasonable, supported by the evidence in the record as a whole, and there is no abuse of discretion." [5] The municipality argues that "[t]he interpretation of the platting and zoning code provisions by Anchorage, and more particularly by those officials charged with their enforcement, is entitled to substantial deference."

■ Because, as we explain below, the municipality prevails on appeal even under the less deferential de novo standard of review, we do not need to decide whether the more deferential standard advocated by the municipality applies here. We will apply a de novo standard of review to the superior court's grant of summary judgment to the municipality and denial of summary judgment to

Spinell, and will uphold a grant of summary judgment if either party meets the customary standards for summary judgment.[6] There must be no genuine issues of material fact, and the moving party must be entitled to judgment as a matter of law.[7]

### B. The Municipality Had Authority To Impose the Conditions and Requirements.

#### 1. AMC 21.15.120(E) empowers the municipality to enforce plat notes against Spinell.

■ Spinell argues that the municipality has no authority to require Spinell to construct and warrant streets or install landscaping as a condition for a building permit or certificate of occupancy. It asserts that the conditions the municipality imposed on the issuance of building permits and certificates of occupancy were only binding on the subdivider of the property. Spinell argues that because it was not the subdivider of any of the properties at issue, the municipality could not require Spinell to construct and warrant streets or install landscaping in order to receive a building permit or certificate of occupancy. We conclude that whether Spinell was the subdivider is irrelevant, because AMC 21.15.120(E) gives the municipality authority to enforce the plat notes and plot notes against Spinell. The municipality did not have to issue building permits or certificates of occupancy as long as the requirements listed on the plat notes were unfulfilled.

Subsection 21.15.120(E) of the Anchorage Municipal Code authorizes the platting authority to place conditions on the final approval of a subdivision plat.[8] The platting

---

5. 944 P.2d 491, 493 (Alaska 1997) (quoting *Kodiak W. Alaska Airlines, Inc. v. Bob Harris Flying Serv., Inc.*, 592 P.2d 1200, 1203 n. 7 (Alaska 1979)).

6. *See Joseph M. Jackovich Revocable Trust v. State, Dep't of Transp.*, 54 P.3d 294, 297 (Alaska 2002).

7. *Id.*

8. AMC 21.15.120(E) (1996) provides:
   The platting authority may place such conditions upon granting of final plat approval as

are necessary to preserve the public welfare in accordance with the subdivision regulations. When such a condition of approval entails a restriction upon the use of all or part of the property being subdivided, a note specifying such restrictions shall be placed on the face of the plat. Such note shall constitute a restrictive covenant in favor of the municipality and the public and shall run with the land, enforceable against all subsequent owners. Any such restrictive covenant may be enforced against the subdivider or any subsequent owner by the municipality or by any specifically affected member of the public.

authority indicates those conditions through notations on the plat. Subsection .120(E) provides that these notes become restrictive covenants in favor of the municipality that run with the land. Spinell attempts to distinguish the conditions and requirements the municipality imposed here from the conditions and requirements running with the land under the code. It argues that the disputed conditions and requirements do not fall within subsection .120(E) and do not run with the land, but instead are "personal obligation[s] imposed on the subdivider by the platting board." Spinell notes that the subdivider must post a performance bond to guarantee the installation of the landscaping, and argues that this condition is a personal obligation rather than a restrictive covenant running with the land. Spinell then argues that it is not a subdivider and does not stand in the place of a subdivider but is merely a subsequent lot owner.

The municipality argues that under AMC 21.15.120(E), "[o]nce the landscaping requirements were set forth on the recorded plat, they became a restrictive covenant, and the land could not be occupied or maintained in a fashion which failed to meet the terms of the plat note." We agree. Subsection .120(E) clearly states that plat notes "may be enforced against the subdivider or any subsequent owner by the municipality." The municipality was not obliged to issue building permits and certificates of occupancy to Spinell or anyone else if the conditions and requirements in the plat notes had not been met.

### 2. The municipality was not required to issue permits and certificates under the Uniform Administrative Code, Uniform Building Code, or Anchorage Municipal Code.

■ Spinell argues that the Anchorage Municipal Code, the 1997 Uniform Adminis-

trative Code (UAC), and the 1997 Uniform Building Code (UBC) [9] required the municipality to issue a building permit or certificate of occupancy whenever an applicant "complies with the administrative and technical requirements provided in the building codes, and the proposed structure constitutes a permitted use of the property under the applicable zoning ordinances." The municipality responds that these codes do not obligate it to issue permits or certificates if the building official finds any violations of those codes or any other laws.

Uniform Administrative Code § 303.1, which governs the issuance of building permits, states in part:

> The application, plans, ... and other data filed by an applicant for permit shall be reviewed by the building official. Such plans may be reviewed by other departments of this jurisdiction to verify compliance with any applicable laws under their jurisdiction. If the building official finds that the work described in an application for a permit and the plans, specifications and other data filed therewith conform to the requirements of this code and the technical codes and other pertinent laws and ordinances, and that the fees specified in Section 304 have been paid, the building official shall issue a permit therefor to the applicant.

Uniform Administrative Code § 309.3, which discusses certificates of occupancy, states in part:

> After the building official inspects the building or structure and finds no violations of the provisions of this code or other laws which are enforced by the code enforcement agency, the building official shall issue a certificate of occupancy....

Spinell argues that these provisions obligated the building official to issue building permits and final (rather than temporary) certificates of occupancy.[10] It is undisputed

---

9. AMC 23.05.010 (1996) adopts by reference the 1997 editions of the UAC and UBC.

10. Spinell cites the Handbook to the Uniform Building Code, the official commentary to the UBC, to support its reading of the UAC and UBC. The commentary explains that the building official must issue a building permit if "the informa-

tion filed with the application shows compliance with the [UBC] and other laws and ordinances.... Thus, the building official would be in violation of the code to withhold the issuance of a building permit for a swimming pool because a cabana was constructed without a permit." Int'l Conference of Bldg. Officials, Handbook to the Uniform Building Code 3 (1995).

that Spinell's applications for building permits and certificates of occupancy complied with administrative and structural requirements for the homes it constructed or planned to construct. It is also undisputed that building the single-family homes Spinell constructed or planned to construct was a permissible use of the land under the applicable zoning ordinances. Spinell asserts that the only requirements that it failed to meet were the additional public improvement conditions the municipality imposed. Spinell argues that the AMC did not authorize these requirements for completing public improvements, and that therefore the building official should have issued the permits and certificates.

But under UAC § 309.3, the municipality does not have to issue a certificate of occupancy if there are any violations of any provisions of the AMC, the UAC, UBC, or the plat notes. A final certificate of occupancy is essentially a guarantee to third parties that the building official inspected the completed project and found no violations of any ordinance, plat note, or building or zoning code.[11] The municipality characterizes Spinell's argument as "ask[ing] this court to ... compel Anchorage to perpetrate widespread fraud upon homebuyers, lenders, title companies, and others" by forcing the municipality to issue final certificates of occupancy despite Spinell's violations of the plat notes. Spinell would have the municipality ignore violations of the plat notes and issue building permits and certificates of occupancy as long as Spinell did not commit those violations. We do not think the UAC, UBC, and AMC require this result.

It is irrelevant to our analysis whether the landscaping had to be installed by Spinell or its predecessors in interest in each of the subdivisions. Our analysis turns on the circumstance that the plat notes contain a restrictive covenant that runs with the land, is tied to the certificate of occupancy, and states that landscaping will be installed in the subdivision. Spinell had both constructive and actual notice of those provisions. The sales agreement for Spinell's purchase of the Muirwood Park Subdivision, for example, contained a handwritten note initialed on behalf of Spinell stating that "[t]his agreement is contingent on the buyer Spinell Homes reviewing and approving the requirements of platting and plat notes." Also illustrative is the plot plan Spinell submitted for a lot in the Ponds Subdivision which indicated where buffer landscaping would be installed and which stated that "[a]ll work shall be done as shown on this plot plan." When the platting authority placed notes on the relevant plats indicating the landscaping requirements, Spinell was placed on constructive notice of those requirements.

Plat notes are covenants that run with the land and are enforceable by the municipality against subsequent owners. The certificate of occupancy is an administrative enforcement tool that enables the municipality to ensure compliance with all laws, conditions, and obligations. Landscaping requirements in Anchorage have historically been tied to the issuance of certificates of occupancy.[12] Because the conditions had not been fulfilled, the municipality was not obligated to issue a certificate of occupancy.

### 3. The performance bonds do not require the municipality to issue building permits and certificates of occupancy.

◼ Spinell argues that per AMC 21.87.055,[13] once the municipality accepts a

---

Similarly, the handbook's commentary to the certificate of occupancy provisions explains that the building official must issue a certificate "when the building official is satisfied that the building or portion thereof complies with the code for the intended use and occupancy." *Id.* at 4.

**11.** 3 KENNETH H. YOUNG, ANDERSON'S AMERICAN LAW OF ZONING § 19 .03, at 362 (4th ed.1996).

**12.** An April 9, 1985 memorandum to the Anchorage Assembly from the mayor, municipal manag-

er, and director of community planning discussed means of enforcing buffer landscaping installation requirements. The memorandum recognized the general practice that "the installation of new landscaping may be tied to a certificate of occupancy." Anchorage Assembly Memorandum AIM 55–85.

**13.** AMC 21.87.055 (1996) states in part:
If the subdivider defaults on any obligation to construct required public improvements or the obligation to warrant and repair such improve-

performance bond from a subdivider to guarantee the installation of public improvements, the municipality's only remedy when improvements are not completed is to proceed against the performance bond, not to deny a certificate of occupancy or building permit. Spinell points to commentary supporting this position:

> Where a subdivision plat has been approved by the planning board and a bond to assure improvement of the streets and other required installations has been furnished, a building permit cannot be withheld on the ground that the street has not been "suitably improved as required by the planning board," as required by a collateral statute. It is contemplated that permits will issue once the bond is furnished, and the map approved and filed.[14]

Relying on this language, Spinell argues that the municipality had to complete the subdivision improvements—particularly the streets in the Michael Subdivision—at its own expense. Spinell claims that the municipality had no authority to withhold building permits or certificates of occupancy from Spinell merely because the improvements had not been constructed. Spinell also cites to a Maryland case in which a developer acquired two subdivision lots from a prior developer who had posted a performance bond to guarantee the improvement of a road adjoining the subdivision.[15] The defendant county issued building permits to the new developer, which began construction. Later, the county threatened to withhold certificates of occupancy until the public improvements were completed. The Maryland Court of Special Appeals ruled that the county could not withhold certificates of occupancy from the new developer once the new developer met the county's building regulations, but could only proceed against the initial developer's performance bond.[16] The court explained that "[i]t would make no sense to require posting of a bond if the performance itself were nonetheless required as a necessary predicate to issuance of the necessary permits." [17]

But here, the subdivision agreement for the Michael Subdivision between the municipality and the initial subdivider expired in 1990, and Spinell did not purchase the subdivision until 1996. It appears undisputed that the municipality could not proceed against the bond posted by the initial developer. The municipality argues in its brief that it could not look to the bond from the original subdivider because that bond had expired and the original subdivider was now defunct. Spinell's reply brief does not rebut that contention. There is no basis for us to think that the original subdivider's bond is still in effect.

Furthermore, as the municipality observes, the language in AMC 21.87.055 regarding default by the subdivider is permissive rather than mandatory. That provision states that in the event of a default by the subdivider the municipality "*may*" demand payment.[18]

■ The AMC does not require the municipality to use public funds to complete subdivision improvements for the benefit of private lot owners when the original subdivider abandons the project and goes out of busi-

---

ments, the municipality may demand immediate payment on the performance or warranty guarantee.... All funds received by the municipality shall be used for any construction, repair or reconstruction necessary to ensure that: (A) [a]ll required public improvements are built to specifications necessary to receive final acceptance....

**14.** 5 Arden H. and Daren A. Rathkopf, The Law of Zoning and Planning § 91.16 (2001). A footnote to the above quotation continues:

> Likewise a certificate of occupancy may not be denied for a model home in an incomplete subdivision where it was constructed pursuant to a valid building permit and the developer posted bonds for the required subdivision improvements, even though the subdivision regu-

lations provide that issuance of certificates of occupancy for such model homes must await completion of on-site and off-site improvements. This provision was construed as to provide only an interim safeguard until performance bonds guaranteeing installation of improvements were posted.

*Id.* at n. 8.

**15.** *Key Fed. Sav. & Loan Ass'n v. Anne Arundel County,* 54 Md.App. 633, 460 A.2d 86 (1983).

**16.** *Id.* at 91.

**17.** *Id.* at 90.

**18.** AMC 21.87.055 (emphasis added).

ness, as the original subdivider did here. The AMC only requires that if the municipality obtains any funds from the performance bonds, it apply those funds towards the construction and installation of the improvements. The municipality had no obligation to accept streets in the Michael Subdivision that did not meet its standards or to repair them at public expense.

### 4. AMC 21.45.125(D) does not prevent the municipality from conditioning certificates of occupancy on the installation of landscaping.

■ Spinell next argues that AMC 21.45.125(D) prevents the municipality from withholding final certificates of occupancy pending the installation of landscaping. Subsection 21.45.125(D), which appears in the AMC chapter titled "Supplementary District Regulations," states that "[a]ll landscaping shall be installed within 18 months after receiving a temporary or final certificate of occupancy, whichever comes first."

But AMC 21.85.190, which appears in the code chapter titled "Subdivision Standards: Improvements," states in part that "[l]andscaping shall be provided on an individual lot basis not later than the issuance of a certificate of occupancy." Spinell advances a strained interpretation of AMC 21.85.190 in an effort to harmonize the two code provisions. Spinell claims that section .190 "makes clear that it is the issuance of the certificate of occupancy that triggers the subdivider's deadline to install the landscaping, and not the other way around." Spinell argues that the date a certificate of occupancy is issued merely "establishes . . . the date of default of the subdivider's obligation to install the landscaping." We disagree. Section .190's location in the AMC chapter on subdivision improvements indicates that it controls the timing for the installation of landscaping improvements in subdivisions.

The section requires the installation of landscaping before the municipality issues a certificate of occupancy.

### 5. The on-lot landscaping requirements for the Michael Subdivision were valid.

■ The twelve Michael Subdivision lots that the municipality subjected to the on-lot landscaping requirement were zoned R–2M. On-lot (also referred to as "visual enhancement") landscaping is not required by AMC 21.40.045(M) for lots zoned R–2M unless the lot contains more than three dwelling units.[19] Spinell argues that because the lots in the Michael Subdivision only had single-family homes, on-lot landscaping was not required. But although the zoning laws did not require on-lot landscaping for the lots in the Michael Subdivision, the plat notes for those lots did. Zoning laws set out the minimum standards that a party must meet. More specific plat notes control over the more general zoning requirements.[20]

### 6. Spinell has not shown that the superior court erred concerning the requirement Spinell get approval from the homeowners' association.

■ For two Ridgemont Subdivision lots, the municipality required Spinell to obtain written approval for the design of its proposed homes from a homeowners' association as a condition for issuing building permits. This requirement was part of the settlement of litigation between the municipality, the homeowners' association, and the prior developer of the subdivision. Spinell obtained the required permission from the homeowners' association and the municipality issued the building permits.

Spinell cites several authorities[21] to support its argument that "[i]t is well estab-

---

**19.** AMC 21.40.045(M) (1996) provides in part: "On lots in the R–2M district containing more than three dwelling units, all areas not devoted to buildings, structures, drives, . . . or other authorized installations shall be planted with visual enhancement landscaping."

**20.** *Alaska R.R. Corp. v. Native Vill. of Eklutna,* 43 P.3d 588, 593 (Alaska 2002) (explaining that

more specific provisions of statute control over more general provisions); *O'Callaghan v. Rue,* 996 P.2d 88, 99 n. 58 (Alaska 2000) (same).

**21.** 8 EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 25 .151, at 558 (3d ed. 2000) ("An ordinance cannot prohibit the issuance of a building permit solely because the proposed use will be contrary to restrictions contained in re-

lished that, where the proposed building complies with the building code and zoning ordinances, a building permit cannot be denied on the ground that the building would violate the terms of a restrictive covenant against the property." There is a dispute about whether the agreement bound Spinell. But because Spinell in fact obtained permission from the association and the municipality issued the permits, and because Spinell has not demonstrated how it was harmed by this requirement, there is no reason for us to decide whether the municipality overstepped.

At most, the requirement slightly delayed the permits (by ten and twenty-nine days). These sorts of delays do not amount to actionable takings.[22] There is no indication that Spinell was deprived of all economically viable use of its property or that it had to alter its design. The fact that this condition was imposed in the context of litigation suggests that this condition does not reflect a blanket policy of the municipality. Instead, this appears to have been a case-specific requirement, and we have not been provided with the specifics.

Spinell consequently has not demonstrated that the superior court erred.[23]

## C. Spinell's Constitutional Claims Have No Merit.

■ Spinell argues that the municipality violated Spinell's right to substantive due process because the municipality breached its mandatory duty to issue unconditioned permits and certificates, and that the municipality's actions were consequently arbitrary, irrational, and not reasonably related to a legitimate governmental purpose. It appears Spinell founds this argument on the proposition that the municipality had no authority to condition the permits and certificates as it did. Thus, Spinell argues that it "has a legitimate claim of entitlement and a protected property interest in the building permit or certificate of occupancy if the municipality has a mandatory duty under its building ordinances to issue the permit if the applicant complies with the criteria specified for its issuance." Spinell recognizes that to maintain a substantive due process claim, it "must establish that it had a protected property interest in the permit or benefit claimed to have been unconstitutionally denied or interfered with." But because we have decided that the municipality did not have a mandatory duty in this case to issue Spinell unconditioned permits and certificates, Spinell cannot establish that it had a protected property interest in unconditioned permits and certificates. It consequently cannot establish a substantive due process violation.

■ Spinell nonetheless claims that the municipality's actions effected a taking because they did not substantially advance a legitimate governmental interest. The Alaska Constitution provides that "[p]rivate property shall not be taken or damaged for public

---

corded covenants applicable to the property for which the permit is sought, since the effect of such a prohibition would be an illegal delegation to private covenantors of the municipality's zoning power."); 3 YOUNG, *supra* note 13, § 20.77 at 673 ("A building permit for a use permitted by the zoning regulations may not be denied on the ground that the use will violate a restrictive covenant."); *see also Friends of Shawangunks, Inc. v. Knowlton*, 64 N.Y.2d 387, 487 N.Y.S.2d 543, 476 N.E.2d 988, 990 (1985) ("[T]he issuance of a permit for a use allowed by a zoning ordinance may not be denied because the proposed use would be in violation of a restrictive covenant.").

22. *Cf. Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); *Joseph M. Jackovich Revocable Trust v. State, Dep't of Transp.*, 54 P.3d 294, 300 (Alaska 2002).

23. The fact portion of Spinell's brief also asserts that for one Muirwood Park Subdivision lot, the municipality refused to issue Spinell a building permit until Spinell obtained written verification from the original subdivider that Spinell had disturbed no living trees on the lot, but the argument portion of its brief does not address this issue, and therefore we do not reach it. *Stosh's I/M v. Fairbanks North Star Borough*, 12 P.3d 1180, 1183 (Alaska 2000) ("where a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal." (quoting *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991))); *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980) ("Failure to argue a point constitutes an abandonment of it.").

use without just compensation."[24] The Alaska Constitution provides greater protection for property owners than does the Fifth Amendment of the United States Constitution.[25]

Spinell first appears to argue that imposing the conditions effected a per se taking. But "where there has been no physical invasion of property, a per se taking will not be found except upon a showing that all economic value of a particular piece of property has been destroyed."[26] There is no basis for finding a per se taking here. The municipality did not physically invade Spinell's land and it did not completely deprive Spinell of all economic value of its land. Indeed, Spinell has constructed houses on many of the lots and sold them to third parties. Moreover, Spinell makes no effort to show that the value of its land was at all altered by the municipality's actions.

Spinell also asserts that the municipality's actions effected a taking on a state-law inverse condemnation theory. Generally if there has been no per se taking, we will engage in a case-specific analysis to determine whether there has been a taking.[27] We consider four factors (known as the [*Anchorage v.*] *Sandberg* [861 P.2d 554 (Alaska 1993)] factors): "(1) the character of the governmental action; (2) its economic impact; (3) its interference with reasonable investment-backed expectations; and (4) the legitimacy of the interest advanced by the regulation or land-use decision."[28] But Spinell's appellate takings argument does not discuss the *Sandberg* factors. We recently declined to conduct a *Sandberg* analysis when the landowners alleging a taking substantively discussed only one of the factors in their briefs.[29] Spinell has not discussed any of the factors here. Furthermore, as we noted above in rejecting Spinell's per se takings claim, Spinell has made no effort to show that the municipality's actions adversely affected the value of Spinell's property.

Spinell also asserts that the municipality's actions effected a taking based on the test established by the United States Supreme Court in *Nollan v. California Coastal Commission*[30] and *Dolan v. City of Tigard*.[31] A *Nollan/Dolan* taking may arise when the government makes "an adjudicative decision to condition [the landowner's] application for a building permit on an individual parcel," as opposed to a legislative determination of general application.[32] Additionally, that individualized condition must require the property owner to dedicate a portion of his or her property to the public.[33]

But Spinell has not demonstrated that the municipality specially required Spinell to dedicate any property for public easements or to construct new streets. The municipality simply required that predetermined municipal requirements be satisfied before it would issue permits or certificates. These requirements were city-wide conditions that, moreover, arose largely out of obligations accepted by Spinell's predecessors. There is no indication Spinell was required to do anything other developers were not required to do to satisfy the plat notes for their subdivisions. To have a *Nollan/Dolan* taking under these circumstances, Spinell would have to demonstrate that the original subdivider could have brought a *Nollan/Dolan* takings claim. Spinell makes no such showing. Indeed, such a claim is inherently at odds with Spinell's argument

**24.** Alaska Const. art. I, § 18.

**25.** *R & Y, Inc. v. Municipality of Anchorage,* 34 P.3d 289, 293 (Alaska 2001).

**26.** *Id.* at 296.

**27.** *Id.* at 293.

**28.** *Id.*

**29.** *Joseph M. Jackovich Revocable Trust v. State, Dep't of Transp.,* 54 P.3d 294, 303–04 (Alaska 2002).

**30.** 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).

**31.** 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).

**32.** *Dolan,* 512 U.S. at 385, 114 S.Ct. 2309.

**33.** *Id.*

that the original subdivider should have been responsible for satisfying the conditions that the municipality imposed on Spinell. If the original subdivider could not have raised a *Nollan/Dolan* claim under the circumstances of this case, we see no basis for Spinell to do so.

 Because Spinell has not shown that the requirements for some minimal landscaping and compliance with the MASS standards were conditions or exactions that were not proportional to the subdivisions' impact, Spinell's *Nollan/Dolan* theory of taking is without merit.

As previously noted, the municipality did impose two conditions that did not obviously arise out of routine enforcement of the plat specifications or subdivision agreement. But even assuming the requirements of homeowners' association approval and "living tree" verification could conceptually support a *Nollan/Dolan* takings claim, Spinell's briefs fail to show that it suffered an impact of the kind or magnitude this theory requires. Certainly the municipality's requirements seem to have been temporary and insignificant restraints, at most. Spinell has not demonstrated that these requirements forced it to dedicate its money or property to a public use. They did not seem to be an "exaction" of the sort contemplated for such claims, and Spinell's briefs fail to show that it has any actionable *Nollan/Dolan* claims.

 Spinell's opening brief also cursorily asserts that the municipality's actions deprived Spinell of equal protection because the municipality has no rational basis for imposing the street and landscaping conditions on developers but not on other permit applicants. As we explained above, we will not consider an appellant's arguments given only cursory treatment in its briefs.[34]

## IV. CONCLUSION

We AFFIRM the decision of the superior court denying Spinell's motion for summary judgment and granting summary judgment to the municipality.