**Certiorari Granted, August 29, 2014, No. 34,834**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2014-NMCA-093**

**Filing Date: June 30, 2014**

**Docket No. 30,930**

**SANTA FE PACIFIC TRUST, INC.,**
**a Florida corporation,**

      **Plaintiff-Appellant,**

**v.**

**CITY OF ALBUQUERQUE, a municipal**
**corporation,**

      **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Nan G. Nash, District Judge**

Chappell Law Firm, P.A.
Bill Chappell, Jr.
Michael Hoeferkamp
Albuquerque, NM

for Appellant

City of Albuquerque
David J. Tourek, City Attorney
Robert I. Waldman, Assistant City Attorney
Albuquerque, NM

Lorenz Law
Alice T. Lorenz
Albuquerque, NM
Campbell & Wells, P.A.
John S. Campbell
Albuquerque, NM

1

for Appellee


Jones, Snead, Wertheim & Clifford, P.A.
Carol A. Clifford
Santa Fe, NM

for tw telecom of N.M., LLC

**OPINION**

**FRY, Judge.**

**{1}** Plaintiff Santa Fe Pacific Trust (SFPT) owned property in downtown Albuquerque, New Mexico (the Property), which two mayors targeted as a potential location for an events arena. Because of considerable publicity surrounding the proposed condemnation, which never came to fruition, and because of various concrete steps taken by the administration of the City of Albuquerque (the City) to see the arena project through, SFPT claims that it lost potential sales and leases of the Property. It filed a complaint against the City asserting, among other things, claims for inverse condemnation and deprivation of due process.

**{2}** We affirm summary judgment entered in favor of the City on these claims. We hold that SFPT failed to demonstrate entitlement to an inverse condemnation claim under federal law, which provides that "[m]ere fluctuations in value during the process of governmental decision[-]making . . . are incidents of ownership [that] cannot be considered as a taking in the constitutional sense." *Agins v. City of Tiburon*, 447 U.S. 255, 263 n.9 (1980) (internal quotation marks and citation omitted), *abrogated on other grounds by Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005). We further adopt a means for assessing whether pre-condemnation planning and publicity can constitute an unconstitutional "taking" under our state laws regarding inverse condemnation and conclude that, while SFPT established the City's present concrete intention to condemn, SFPT failed to show that the City took any action that substantially interfered with the use and enjoyment of the Property. We also conclude that SFPT failed to establish its substantive due process claim.

**BACKGROUND**

**Factual Background**

**{3}** Although SFPT maintains that there are disputed facts regarding the City's intent during the time leading up to this lawsuit, most of the operative facts are undisputed. SFPT purchased the Property in 1997 and, in 2000, it began a business known as Bigbyte.cc on the Property for disaster recovery, data storage, and co-location. SFPT and Bigbyte.cc are related entities, with the same shareholders, directors, and corporate officers. Beginning in 2003, Bigbyte.cc leased approximately 66.26 percent of the leasable space in the building on the Property.

**{4}** At about this same time, in articles published in late 1998 and early 1999, Mayor Jim Baca began to publicly express interest in developing a downtown arena. In 1999, Mayor Baca informed SFPT's principals that the Property was the best site for an arena project and that the Property would be taken for that purpose.

**{5}** In May 2000, the City adopted the 2010 Downtown Development Plan that included the goal of constructing an events arena on a proposed site that included the Property.

3

Before anything definitive was done in furtherance of this goal, in September 2003, SFPT and the City entered into an agreement (Exchange Agreement), which recited that the City wanted to obtain title to a parcel owned by SFPT (SFPT tract) on the southeast corner of the Property and that SFPT wanted to obtain title to a parcel owned by the City (City tract) on the northeast corner of the Property. The Exchange Agreement provided that SFPT would grant the City a permanent roadway easement covering the SFPT tract and that the parties would then exchange title to their respective tracts. The Exchange Agreement contemplated that the City and SFPT would share the cost of certain improvements to the City tract before the exchange would take place. SFPT conveyed the easement to the City, but the exchange of title did not take place. The Exchange Agreement did not say anything about the main portion of the Property, which contained the building that housed Bigbyte.cc and office space that SFPT wanted to lease to other commercial entities. Therefore, in this Opinion, we use the term "the Property" to denote the property owned by SFPT that did not include either the SFPT tract or the City tract.

**{6}** In January 2004, the City administration began a process to determine the feasibility of its goal to construct the arena, issued a request for information (RFI) to interested developers, and publicly announced the proposed project. Arena Management and Construction, LTD (AMC) responded to the RFI and proposed financing for the arena without the need for public guarantee or subsidy. The city council approved a memorandum of understanding (MOU) with AMC regarding AMC's financing commitment. The City then conducted preliminary negotiations with SFPT to determine whether the Property could be acquired by purchase agreement.

**{7}** Ultimately, however, AMC could not provide a commitment for the financing proposed by the MOU. The City administration, as a result of its negotiations with SFPT, then submitted to the city council a proposed purchase agreement and an option agreement to buy the Property. The city council did not approve either agreement.

**{8}** The City administration in September 2006 issued a request for proposal (RFP) on the arena project that included the Property, and ABQ Downtown Development Team (ADDT) submitted a proposal. The City administration recommended that ADDT be awarded a contract under the RFP, but the city council did not approve the recommendation.

**{9}** The City administration continued to explore the possibility of purchasing the Property from SFPT. In 2008, ADDT submitted a proposal for the arena that included an alternate location at Central and Broadway, and the city council approved the proposal that ADDT submit a viability assessment study for the arena at the Central and Broadway location. As of the date the City filed its motion for summary judgment in this case, the arena project continued to be a planning goal of the City administration, and the proposed site for the arena included the alternate Central and Broadway location.

**{10}** From 1999 through 2007, local newspapers published many articles about the proposed arena project, and several articles mentioned the Property as a potential site for the

4

arena. One article labeled a diagram of the Property with the phrase, "To be condemned," and another article labeled a photo of the Property with "slated for condemnation." Many City-generated documents also showed potential placement of the arena on the Property and expressed the City's desire to acquire the Property. Mayor Baca's successor, Mayor Martin Chávez, held press conferences at which he indicated that the Property was the potential location for the arena project. In January 2004, Mayor Chávez announced that construction on the arena was expected to begin in late spring. Subsequent announcements indicated the imminent beginning of construction. However, the city council never approved the acquisition or condemnation of the Property or appropriated funding for construction of an arena.

**{11}** SFPT submitted evidence that during this period of time from 2004 to 2008, several entities considered buying or leasing part or all of the Property and then declined to do so. While some potential buyers and tenants indicated that they lost interest in the Property because of the City's threatened condemnation, others had different reasons for declining to buy or lease the premises or they did not state why they opted not to buy or lease. For whatever reason, it is undisputed that as of August 2009, SFPT had been unable to lease the third floor of the Property despite there being interested parties. Also during that time, SFPT would have operated at a loss if not for leases to related companies, such as Bigbyte.cc.

**Proceedings**

**{12}** SFPT filed suit against the City in October 2006 and asserted claims for inverse condemnation (alleging that the City's publicizing its plan to condemn the Property caused the loss of tenant leases), deprivation of due process (alleging deprivation of tenant leases without due process), tortious interference with contractual relations (related to loss of tenant leases), and breach of contract (related to the Exchange Agreement).

**{13}** On the City's motion, which SFPT did not oppose, the district court dismissed SFPT's claim of tortious interference. The City then filed a motion for summary judgment on SFPT's claims for inverse condemnation and deprivation of due process. While that motion was pending, the City filed a condemnation complaint against SFPT seeking to acquire SFPT's interest in the Exchange Agreement and in both the SFPT tract and the City tract that were the subjects of the Exchange Agreement. The district court consolidated SFPT's action against the City with the City's action against SFPT.

**{14}** The district court entered summary judgment in favor of the City on SFPT's claims of inverse condemnation and deprivation of due process. This left unresolved SFPT's claim against the City for breach of the Exchange Agreement and the City's condemnation claim (related to the exchange property) against SFPT. The parties ultimately settled these outstanding claims, and the district court dismissed them.

**{15}** SFPT appeals the summary judgment in favor of the City and the district court's order quashing subpeonas issued to two non-parties, TW Telecom of New Mexico, LLC, and

5

Prism Technologies, LLC. Because we affirm the district court's summary judgment on SFPT's claims for inverse condemnation and deprivation of due process, we need not address the order quashing the subpoenas. This is because the information sought by the subpoenas related to potential lessees lost as a result of the City's pre-condemnation planning and publicity, and we conclude that the loss of lessees does not constitute damage to or taking of property under the circumstances of this case.

**DISCUSSION**

**A.      Summary Judgment**

**{16}** We review an order granting summary judgment de novo. *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* In addition, whether the facts are enough to constitute a taking is a question of law. 11 Eugene McQuillin, *The Law of Municipal Corporations*, § 32.26 at 521-23 (2010).

**{17}** In its motion for summary judgment, the City argued that its activities with respect to the Property amounted to nothing more than planning and publicity surrounding the proposed arena project and that planning and publicity do not constitute a "taking" under either New Mexico or federal condemnation law. In response to the motion, SFPT generally argued that New Mexico law recognizes that damage to property—without a physical invasion of property—can give rise to a claim for inverse condemnation. SFPT further argued that the City's activities, which included mayoral press conferences and other publicity specifically targeting the Property, damaged SFPT's interest in the Property and therefore constituted a taking. SFPT also maintained that the City's failure to convey its tract as required by the Exchange Agreement deprived SFPT of the physical use of that tract, and that this deprivation informed the analysis of whether a taking had occurred.

**{18}** In its letter decision granting the City's motion for summary judgment, the district court determined that the City's pre-condemnation planning and publicity regarding the Property was not a taking for purposes of inverse condemnation. Relying on an Alaska case with similar facts, the court concluded that "the City's publicity does not show a present concrete intention to acquire the Property. Additionally, [SFPT] has not shown that the City substantially interfered with [its] property rights by denying a permit or otherwise prohibiting [SFPT] from using the [P]roperty beneficially." The court also concluded that "[t]he facts of the Exchange Agreement . . . are not sufficiently tied to the Property claims to defeat [the] City's motion." As for SFPT's claim of a due process deprivation, the court determined that the claim was subsumed into its inverse condemnation claim and that "[w]ithout a taking, the [c]ourt cannot find that [SFPT]'s due process rights were violated."

**{19}** On appeal, SFPT makes nine arguments challenging the summary judgment in favor of the City, which we combine into five. SFPT argues that: (1) the district court erroneously

applied the Alaska and federal standards regarding what constitutes a taking and that under the proper standards, the City's activities constituted a taking as a matter of law; (2) the district court erroneously determined that SFPT had no claim for deprivation of due process; (3) alternatively, the City's breach of the Exchange Agreement constituted a physical taking that resulted in injury to the Property, which was adjacent to the tracts covered by the Exchange Agreement; (4) disputed issues of fact regarding the City's intent to condemn the Property precluded summary judgment; and (5) the district court erroneously ruled on two preliminary issues by improperly fixing the date of the alleged taking and by failing to allow a complete deposition of Mayor Chávez.

## 1. Applicable Standards

**{20}** SFPT's inverse condemnation claim relied on both federal law and state law. SFPT contends that the district court applied erroneous standards in rejecting both aspects of its claim.

## a. Federal Law

**{21}** The district court rejected SFPT's claim of inverse condemnation under the takings clause of the Fifth Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment. In doing so, the court relied in part on *Agins*, in which the United States Supreme Court stated that a city's pre-condemnation activities did not "so burden[] the appellants' enjoyment of their property as to constitute a taking." 447 U.S. at 263 n.9. The Court in *Agins* also stated that "[m]ere fluctuations in value during the process of governmental decision[-]making, absent extraordinary delay, are incidents of ownership. They cannot be considered as a taking in the constitutional sense." *Id.* (internal quotation marks and citation omitted). The district court also mentioned *First English Evangelical Lutheran Church v. County of Los Angeles*, which discussed *Agins* and another United States Supreme Court decision, and stated that "these cases merely stand for the unexceptional proposition that . . . depreciation in value of the [condemned] property by reason of preliminary activity is not chargeable to the government." *First English Evangelical Lutheran Church*, 482 U.S. 304, 320 (1987), *holding limited on other grounds by Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002).

**{22}** SFPT challenges the district court's reliance on *Agins* and *First English* because "the *Agins* decision was overruled in *Lingle*." In addition, SFPT argues that the district court should have applied the balancing test in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 122-23 (1978). We do not agree with SFPT's argument regarding *Agins* and, even if the *Penn Central* test is applied, it does not support SFPT's contention that the City's planning and publicity in this case constituted a taking under the United States Constitution.

**{23}** First, as SFPT itself acknowledges, the United States Supreme Court in *Lingle* did not overrule or abrogate the statement in *Agins* to the effect that pre-condemnation

governmental activities do not constitute a taking. Instead, the Court eliminated one of the methods of identifying regulatory takings that was announced in *Agins*. *See Lingle*, 544 U.S. at 545 (explaining that "the 'substantially advances' formula announced in *Agins*[, which held that the application of a zoning law to a property is a taking if the law does not substantially advance legitimate state interests,] is not a valid method of identifying regulatory takings for which the Fifth Amendment requires just compensation"). Thus, the undisturbed portion of *Agins* is persuasive authority for the proposition that federal law would not recognize the City's planning and publicity in the present case as a taking under the United States Constitution.

{24}    Second, the balancing test of *Penn Central* does not support SFPT's position in this case. *Penn Central* involved the question whether New York City's historic preservation restrictions, which culminated in a prohibition against specific development schemes for Grand Central Terminal, constituted a taking under the Fifth Amendment. 438 U.S. at 115-18. In answering the question in the negative, the Court reviewed the ad hoc factors that may inform the determination of what constitutes a taking, including (1) the economic impact of the government regulation on both the claimant and "investment-backed expectations," *id.* at 124, (2) the character of the government action (i.e., physical invasion versus burdening economic interests "to promote the common good"), *id.*, and (3) whether the government action acquires "resources to permit or facilitate uniquely public functions." *Id.* at 128. The problem with application of these factors to the circumstances in the present case is that the Court in *Penn Central* drew the factors from cases where there was either a concrete government action, such as a regulation or the acquisition of resources that "interfere[d] with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes." *Id.* at 125; *see id.* 124-28 and cases cited therein. Here, SFPT has not shown the existence of such concrete government action or acquisition of resources; it has shown nothing more than "[m]ere fluctuations in value during the process of governmental decision[-]making," which are "incidents of ownership" that "cannot be considered as a taking in the constitutional sense." *Agins*, 447 U.S. at 263 n.9 (internal quotation marks and citation omitted). We therefore conclude that the district court properly granted summary judgment to the City on SFPT's federal inverse condemnation claim.

b.    **State Law**

{25}    In rejecting SFPT's state law claim, the district court's letter decision cited *Joseph M. Jackovich Revocable Trust v. State Department of Transportation*, 54 P.3d 294 (Alaska 2002), which, like the present case, involved pre-condemnation activities of a governmental entity that allegedly resulted in reduced values for targeted properties. *Id.* at 295. The Alaska Supreme Court in *Jackovich* relied on a two-part inquiry to determine whether pre-condemnation publicity and planning constitute a taking and concluded that a court must ask (1) whether the government had "publicly announced a present intention to condemn" the property in question and (2) whether the government had "done something that substantially interferes with the landowners' use and enjoyment of [its] propert[y]." *Id.* at 300-01. The

district court in the present case concluded that the City's planning and publicity failed to satisfy either requirement.

**{26}** SFPT challenges the district court's reliance on *Jackovich*, arguing that requiring a claimant to show the government's actual intent to condemn property and its substantial interference with property interests is contrary to New Mexico law. We are not persuaded. While SFPT is correct that New Mexico law permits an inverse condemnation action even if the government's proposed damage to property is not a certainty and even if there is no actual physical taking of property, we nonetheless conclude that in circumstances like those before us, the *Jackovich* inquiries are useful and consistent with New Mexico precedent.

**{27}** We begin with New Mexico's pertinent constitutional and statutory provisions. Article II, Section 20 of the New Mexico Constitution states, "Private property shall not be taken or damaged for public use without just compensation." The applicable statute provides:

> A person authorized to exercise the right of eminent domain who has taken or damaged or who may take or damage any property for public use without making just compensation or without instituting and prosecuting to final judgment in a court of competent jurisdiction any proceeding for condemnation is liable to the condemnee . . . for the value thereof or the damage thereto at the time the property is or was taken or damaged[.]

NMSA 1978, § 42A-1-29(A) (1983). Case law interpreting these provisions establishes that a potential condemnor's damage to property is compensable for purposes of inverse condemnation and that an actual physical taking of property is not required. *See Bd. of Cnty. Comm'rs v. Harris*, 1961-NMSC-165, ¶ 5, 69 N.M. 315, 366 P.2d 710 (stating that "in order for an owner to be entitled to compensation a taking is not required—it being sufficient if there are consequential damages"); *see also City of Santa Fe v. Komis*, 1992-NMSC-051, ¶ 11, 114 N.M. 659, 845 P.2d 753 (explaining that "[the] objective in a condemnation case is to compensate the landowner for damages actually suffered. . . . [I]f loss of value can be proven, it should be compensable regardless of its source.").

**{28}** But this does not mean that any and all consequential damage to property arguably caused by the pre-condemnation activity and publicity of a potential condemnor is compensable in a claim for inverse condemnation. Our Supreme Court clarified in *Public Service Co. of New Mexico v. Catron* that "[m]erely rendering private property less desirable for certain purposes . . . will not constitute the damage . . . but the property itself must suffer some diminution in substance, or be rendered intrinsically less valuable, by reason of the public use." 1982-NMSC-050, ¶ 7, 98 N.M. 134, 646 P.2d 561 (internal quotation marks and citation omitted). Thus, the Court in *Catron* concluded that owners of property adjacent to property condemned for installation of a high voltage transmission line were not entitled to compensation for the loss in property value resulting from the transmission line's noise or from its interference with the view and radio/TV reception. *Id.* ¶¶ 8-15.

9

**{29}** Similarly, our Supreme Court stated in *Estate and Heirs of Sanchez v. County of Bernalillo* that a property owner's right to the use and enjoyment of his or her property "does not entitle an owner to use property for all economically viable purposes, and governmental actions imposing an incidental economic loss will be upheld." 1995-NMSC-058, ¶ 11, 120 N.M. 395, 902 P.2d 550. In that case, the Court affirmed summary judgment in favor of the county, which had denied the plaintiff's application for a special use permit in order to develop its property into a mobile home park. *Id.* ¶ 4.

**{30}** These cases teach that in order to be compensable, a taking of or damage to property must invade some substantive or intrinsic aspect of a landowner's right to the use and enjoyment of its property. An incidental economic loss is not sufficient. The current case presents the question whether pre-condemnation publicity and planning can give rise to a cognizable action for inverse condemnation, a question our appellate courts have never had the opportunity to address. Courts in other jurisdictions have considered similar situations, and their reasoning is consistent with the general principles of New Mexico's law regarding inverse condemnation.

**{31}** The *Jackovich* case is instructive. In that case, the state of Alaska had developed plans for a road extension project that would ultimately be built on or near property owned by the plaintiffs. 54 P.3d at 295. The state held public hearings on the location of the project and revised the project's design over a period of fifteen years. *Id.* Over the years, the state notified landowners that would be impacted by the project as to the project's progress. *Id.* The landowners filed an inverse condemnation action "alleging de facto takings of and damage to their properties." *Id.* at 296. The Alaska Supreme Court affirmed summary judgment in favor of the state. *Id.* at 304.

**{32}** The *Jackovich* court summarized the facts of the case as involving "pre-condemnation publication of notices, information, plans, and proposals pertaining to a road improvement project component that . . . might or might not be built." *Id.* at 297. Like SFPT in the present case, the landowners in *Jackovich* complained that all of these activities caused them to be "unable to sell their properties" and to "[lose] rental income because pre-condemnation announcements discouraged buyers and renters and made improvements infeasible or economically imprudent." *Id.* at 298. And, like the New Mexico Constitution, Alaska's constitution prohibits the taking of *or damage to* property for public use without just compensation. *Id.* In determining whether pre-condemnation planning and publicity can constitute a taking or damage in an inverse condemnation case, the *Jackovich* court adopted the two-part inquiry previously mentioned. *Id.*

**{33}** The two-part *Jackovich* inquiry makes sense. As for the first requirement—a present intention to condemn specific property—it would be imprudent to allow compensation in an inverse condemnation case if the condemning entity did not have such a present intention. For example, if the mayor of Albuquerque announced that the city was considering the possibility of condemning certain property, at the earliest, twenty years from now, any damage to the condemnee's property would be purely speculative. With respect to the

10

second requirement—action that substantially interferes with the use and enjoyment of the potential condemnee's property—policy considerations support this requirement. The mere planning or plotting of a public improvement cannot alone be enough to suffice, even if the publicity surrounding the planning results in economic damage to the owner of the targeted property. "If the rule were otherwise, it would encourage [condemning entities such as] municipalities to operate secretively and to act as quickly as possible which would inhibit free discussion of the merits of a project. It would also discourage a municipality from considering alternative sites, since that would just add to the municipality's potential liability." McQuillin, *supra*, § 32.37 at 626 (footnotes omitted).

**{34}** These requirements are also consistent with the teachings of New Mexico case law. Our Supreme Court in *Electro-Jet Tool and Manufacturing Co. v. City of Albuquerque* stated that "[t]he damage must be the result of the public entity's *deliberate* taking or damaging of the property in order to accomplish the public purpose[,]" 1992-NMSC-060, ¶ 9, 114 N.M. 676, 845 P.2d 770 (emphasis added), which is similar to the requirement in *Jackovich* for a present concrete intention to condemn. And, as we have already observed, New Mexico law requires the condemning authority to take some action that substantively invades the potential condemnee's intrinsic use and enjoyment of its property, which is similar to the *Jackovich* requirement that the public entity must do something that substantially interferes with the landowner's use and enjoyment.

**{35}** We are not persuaded by SFPT's argument that *Electro-Jet* supplies a different standard for the public entity's intentions. In *Electro-Jet*, our Supreme Court addressed the meaning of the phrase "for public use" in the condemnation provisions of our constitution and statutes. 1992-NMSC-060, ¶ 1 (internal quotation marks omitted). The Court concluded that a property owner seeking damages for inverse condemnation must prove more than negligence on the part of the public entity. *Id.* ¶ 22. This is entirely consistent with a requirement that the property owner prove a present concrete intention to condemn.

**{36}** Nor are we persuaded that a present concrete intention to condemn is "tantamount to an actual condemnation," as SFPT maintains. In keeping with our case law, "condemnation" is synonymous with both a taking of and damage to property. Therefore, a present concrete intention to condemn is an intention to take or to damage the landowner's property.

**{37}** We conclude that the district court's reliance on *Jackovich* was not misplaced, and we adopt the *Jackovich* two-part inquiry for determining whether planning and publicity related to a potential condemnation establish a public entity's liability for inverse condemnation. The inquiry is consistent not only with existing New Mexico law but also with the leading authorities on the subject. For example, *Nichols on Eminent Domain* mirrors the second *Jackovich* inquiry and states that of the bundle of rights or "sticks" that comprise the concept of property, "[o]nly certain sticks—e.g., the right of possession—are afforded full protection by the [laws requiring compensation for public takings]. Under that analysis certain other 'sticks'—e.g., the right to use and develop property—are afforded

11

significantly less protection." 2A Julius L. Sackman, *Nichols on Eminent Domain*, ch. 6, § 6.01[8] at 6-19 (MB 3d ed. 2013) (footnotes omitted). Thus, the public entity in question must take some action that substantially interferes with the landowner's use and enjoyment. Similarly, the McQuillin treatise states that the "mere manifestation of intent to take or a threat to condemn does not constitute condemnation blight warranting recovery for reduction in value of property." McQuillin, *supra*, § 32.37 at 624. There must also be "some direct restriction on the use of the property." *Id.* at 626.

**{38}** We are further unpersuaded by SFPT's argument that New Mexico law has adopted a "reasonableness" standard that is applicable in the present case. Even if SFPT is correct that reasonableness governs the assessment of damages in a condemnation case, there must first be damage to or taking of property before the assessment of damages comes into play. *See* § 42A-1-29(A) (stating that liability for damage to property occurs when a condemnor "has taken or damaged or . . . may take or damage any property for public use without making just compensation").

**{39}** Having established the state law standards for determining whether pre-condemnation planning and publicity constitute damage to or taking of property, we now apply these standards to the circumstances in the case before us. We conclude that SFPT established only one of the two *Jackovich* requirements that we have adopted. SFPT's evidence showed that the City—at least the City's administration—intended to condemn the Property as soon as it was able to obtain financing, an agreement with a developer, and, importantly, approval of everything by the city council. However, SFPT failed to establish that the City's actions substantially interfered with SFPT's use and enjoyment of the Property.

**{40}** Regarding the present concrete intention to condemn the Property, SFPT's evidence showed that the City's administration publicly announced its desire to condemn the Property and took significant steps demonstrating its intention by issuing the RFI, by obtaining city council approval of the MOU with AMC, and by issuing the RFP. We emphasize the importance of the steps the administration took beyond simply announcing a desire to explore the arena project and vetting that proposal publicly. As we have already mentioned, a city's public airing and exploration of possible development plans are to be encouraged and cannot, by themselves, give rise to a claim of inverse condemnation. Here, the RFI, the MOU, and the RFP went beyond the planning and publicity stage and demonstrated a committed, substantive intention to condemn the Property if means could be found to do so.

**{41}** But the publicity, the planning, the RFI, the MOU, and the RFP did not substantially interfere with SFPT's use and enjoyment of the Property. Indeed, SFPT acknowledged at a hearing that it was not claiming that the Property had been "rendered totally useless and that no tenants will continue [to] lease." While the evidence demonstrated that some potential tenants of the building on the Property were deterred by the possibility of imminent condemnation, this is not the kind of interference that rises to the level of unconstitutional damage to or taking of property. As our Supreme Court said in *Catron*, "[m]erely rendering

12

private property less desirable for certain purposes . . . will not constitute the damage . . . but the property itself must suffer some diminution in substance, or be rendered intrinsically less valuable, by reason of the public use." 1982-NMSC-050, ¶ 7 (internal quotation marks and citation omitted). The City's planning activities, which never came to fruition, did not prevent SFPT from possessing the Property or from using it. The City never physically appropriated the use of the Property, it never contacted existing or prospective tenants, it never denied SFPT any use permits related to the Property, and it never enacted any ordinances or regulations that changed the use of the Property. *See Estate & Heirs of Sanchez*, 1995-NMSC-058, ¶¶ 7, 10 (explaining that a taking is not unconstitutional unless the government's action "deprives the [property] owner of all beneficial use of [the subject] property").

**{42}** All government actions will have some incidental economic consequences, and anyone owning property near the site of such activity will bear the risk of those consequences. But unless the government's actions directly restrict the use of that property, the property owner is not entitled to compensation for those actions. *See* McQuillin, *supra*, § 32.37 at 625-26 (explaining that "[p]ublicly targeting a property for condemnation, resulting in economic damage to the owner, is not a taking unless there is some direct restriction on the use of the property"). Governmental entities, like the City, must be encouraged to air their planning ideas in public so that they can be fully vetted, challenged, improved, or rejected. We therefore conclude that the district court properly granted the City summary judgment on SFPT's claims for inverse condemnation under both federal and state law.

## 2. Alleged Due Process Violation

**{43}** We also conclude that the district court correctly granted summary judgment on SFPT's claim that it was deprived of due process, albeit on slightly different grounds than those relied on by the district court. While the district court determined that "[SFPT]'s due process claim seems to be subsumed into their taking claims," the federal circuit courts are divided on this question, and the United States Supreme Court has not provided clear direction. *See* Brian W. Blaesser & Alan C. Weinstein, *Federal Land Use Law & Litigation*, § 1:14 (2013) (explaining that "recent decisions by the Supreme Court may also limit substantive due process claims in land use cases" and that the circuit courts are split on the issue). But, in any event, it seems clear that federal law will not recognize a substantive due process claim in the land use context unless there has been a government regulation impacting the property owner's use. *See* Blaesser & Weinstein, *supra*, Ch. 1 (stating that "[f]ederal substantive due process in land use regulation refers to the right of a property owner not to be subject to arbitrary or capricious regulatory action by a government legislative or administrative body"). Here, the city enacted no ordinance or regulation impacting SFPT's use of the Property, and its activities planning and publicizing the idea of the arena do not rise to the level of a regulatory action. As a result, SFPT's claim of a due process violation fails.

13

### 3.     The Exchange Agreement Did Not Constitute a Taking

**{44}**     SFPT appears to argue in the alternative that the City's alleged breach of the Exchange Agreement resulted in injury to the Property and therefore provided the basis for SFPT's inverse condemnation claim.  We agree with the district court's assessment that "[t]he facts of the Exchange Agreement property are not sufficiently tied to the Property claims to defeat [summary judgment]."

**{45}**     The property involved in the Exchange Agreement—the City tract and the SFPT tract—were adjacent to the Property itself.  The agreement provided that SFPT would convey a permanent roadway easement to the SFPT tract, the City and SFPT would share the cost of improvements to the City tract, and then the City would exchange title to its tract for title to SFPT's tract.  While SFPT conveyed the easement to the City, the ensuing exchange had not taken place as of the time of the summary judgment motion.

**{46}**     SFPT argues that the failed culmination of the Exchange Agreement damaged the Property by eliminating its use of two access points on the City tract and by taking possession of the SFPT tract by way of the easement.  Yet SFPT fails to demonstrate how the alleged loss of two access points and the SFPT tract negatively impacted the Property. It does not show that the loss of either prevented its beneficial use of the Property.

**{47}**     In fact, SFPT's claim of damages was related to the loss of its ability to lease the Property due to the publicity and planning surrounding the potential condemnation of the Property, not due to any negative impact related to the tracts at issue in the Exchange Agreement.  SFPT's complaint and amended complaint did not even mention the Exchange Agreement in connection with its claims of inverse condemnation and deprivation of due process.  SFPT's claims in connection with the Exchange Agreement were asserted in a separate count for breach of contract, and the parties ultimately settled these claims.

**{48}**     We are not persuaded by SFPT's reliance on our Supreme Court's decision in *Komis*, which SFPT claims stands for the proposition that a partial taking of property can result in damages for a "perceived loss" to the remaining property.  SFPT reads too much into the *Komis* opinion.  *Komis* involved property partially condemned for construction of a highway used in transporting nuclear waste to the Waste Isolation Pilot Project near Carlsbad, New Mexico.  1992-NMSC-051, ¶¶ 2, 4.  The jury awarded the property owners damages in compensation for the property taken and for the perceived loss to the remaining property "due to public perception of the effect of transporting radioactive waste material." *Id.* ¶¶ 4-5.

**{49}**     We have no quarrel with SFPT's contention that damages may be recoverable for perceived loss to property remaining after a partial condemnation.  But here there has been no condemnation, and *Komis* does not change that fact.  *Komis* addressed the measure of damages, not what constitutes a taking.  And, even if the City's alleged non-compliance with the Exchange Agreement could be deemed a taking, SFPT failed to tie this non-compliance

14

to any loss of use related to the Property. The alleged loss of two access points is meaningless unless it can be established that the loss negatively impacted SFPT's use of the Property.

**4. Alleged Disputed Issues of Fact**

**{50}** SFPT argues that the evidence created disputed issues of fact regarding the City's intent to condemn and the reasonableness of the City's pre-condemnation conduct. We have already determined that SFPT established that the City had a present concrete intention to condemn the Property, and we have rejected SFPT's argument that reasonableness is the standard by which pre-condemnation conduct is assessed. We therefore need not address this contention further.

**5. Preliminary Issues: Fixing the Date of the Alleged Taking and Restricting the Scope of Mayor Chávez's Deposition**

**{51}** SFPT raises two final arguments, maintaining that the district court erroneously required SFPT to commit to a date of the alleged taking and that the court improperly restricted the scope of SFPT's inquiry at the deposition of Mayor Chávez. We perceive no error in either ruling.

**{52}** With regard to the date of the alleged taking, SFPT acknowledges that Section 42A-1-29 contemplates a specific date in order to allow calculation of compensation that is due when a taking occurs. But SFPT contends that the taking in this case occurred over a period of time, and, therefore, the date of the taking was a factual issue for the jury to determine. This argument is unavailing. Because we have determined that summary judgment was appropriate, there is no need to calculate compensation, and the date of the alleged taking is therefore irrelevant.

**{53}** As for the restriction on the scope of Mayor Chávez's deposition, the district court limited SFPT's inquiry to dates occurring prior to January 7, 2004, the date of one of the mayor's press conference. We review orders regarding discovery matters for abuse of discretion. *See Estate of Romero ex rel. Romero v. City of Santa Fe*, 2006-NMSC-028, ¶ 6, 139 N.M. 671, 137 P.3d 611.

**{54}** After SFPT gave notice that it intended to take Mayor Chávez's deposition, the City filed a notice of non-appearance and motion for protective order. In its pleadings related to this motion, the City argued that SFPT already had all of the information it needed about the City's intentions regarding the Property via the publicity and other documents SFPT had presented as exhibits to other pleadings. SFPT responded that it was important to depose the mayor to discover the basis for his public statements about the Property, what instructions he gave to staff about the proposed condemnation, and what communications he had with the city council.

15

**{55}** At the hearing on the motion, the City appeared to argue that the mayor did not do anything after the date established for the taking, January 1, 2004, and, as a result, inquiry into that time period would be irrelevant. SFPT responded that "the announcements and activities that took place in January of 2004 and subsequently, went over the top" and that SFPT needed to "go into the background of the—what justification, if any, there was for the activities that started occurring in January of 2004."

**{56}** Ultimately, the district court ruled that the dispositive date was January 1, 2004, the date previously set for the taking, and that "things done after that are not relevant." At SFPT's request, the court then amended the cutoff date to January 7, 2004, the date when the public announcement of the proposed condemnation was made.

**{57}** We fail to see how inquiry into Mayor Chávez's post-January 7, 2004 rationale for public statements, instructions to staff, or communications with the city council would have made any difference to SFPT's claims. There was no dispute about the actions the City actually took after January 7, 2004, and we have determined that none of those actions—either before or after January 7, 2004—constituted damage to or taking of the Property. Without an *action* that substantially interfered with SFPT's beneficial use of the Property, it is simply irrelevant to consider what motives lay beneath the surface. The district court acted within its discretion in limiting SFPT's questioning to events occurring prior to January 7, 2004.

**CONCLUSION**

**{58}** For the foregoing reasons, we affirm the district court's judgment in favor of the City.

**{59}** **IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Judge**

_____
**J. MILES HANISEE, Judge**

16